Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MATTHEW SMITH,                            )
       Plaintiff,                        )
  -vs-                                    ) No. 14 CV 1789
COOK COUNTY, COOK COUNTY SHERIFF          )
TOM DART, SGT. CONNELLY, AND              )
UNKNOWN COOK COUNTY CORRECTIONAL          )
OFFICERS 1-5,                             )
       Defendants.                       )

      The deposition of AUGUSTUS ALABI, RN, called by the Plaintiff for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before Patricia M. Stone, a Certified Shorthand Reporter of the State of Illinois, at Suite 1800, 70 West Madison Street, Chicago, Illinois, on the 14th day of December, 2015, at the hour of 12:46 o'clock p.m.

REPORTED BY: PATRICIA M. STONE, CSR

LICENSE NO: 084-002880

JOB NO: 8906

Thompson Court Reporters, Inc
(312) 421-3377

Page 2

```
 1   A P P E A R A N C E S:
 2
 3      BUTLER RUBIN SALTARELLI & BOYD, LLP
 4      BY:  MR. THOMAS J. KENNEDY
 5         70 West Madison Street, Suite 1800
 6         Chicago, Illinois 60602-4257
 7         (312) 696-4460
 8         tkennedy@butlerrubin.com
 9         Representing the Plaintiff;
10
11      COOK COUNTY STATE'S ATTORNEY'S OFFICE
12      BY:  MR. JOHN POWER
13         69 West Washington Street, Suite 3200
14         Chicago, Illinois 60602
15         (312) 603-4370
16         john.power@cookcountyil.gov
17         Representing the Defendant.
```

Page 3

```
 1            I N D E X
 2   WITNESS                    EXAMINATION
 3   AUGUSTUS ALABI, RN
 4      By Mr. Kennedy                4
 5      By Mr. Power                199
 6
 7
 8
 9
10
11            E X H I B I T S
12   NUMBER                    MARKED FOR ID
13   Alabi Deposition Exhibits
14   Exhibit 25                   34
15   Exhibit 26                   43
16   Exhibit 27                   43
```

Page 4

```
 1              (WHEREUPON, the witness was duly
 2              sworn.)
 3            A U G U S T U S  A L A B I,
 4   called as a witness herein, having been first duly
 5   sworn, was examined and testified as follows:
 6              EXAMINATION
 7   BY MR. KENNEDY:
 8      Q.  Good afternoon, Mr. Alabi.
 9      A.  Good afternoon.
10      Q.  My name is Tom Kennedy.  I am the attorney
11   for Matthew Smith --
12      A.  Okay.
13      Q.  -- in this matter, and you're here for a
14   deposition today.
15          Have you ever been deposed before?
16      A.  Yeah.
17      Q.  You have.  How many times have you --
18      A.  A couple of times.
19      Q.  A couple of times as in two or --
20      A.  Two.
21      Q.  Two times exactly?
22      A.  Uh-huh.
23      Q.  And can you describe the nature of the
24   cases --
```

Page 5

```
 1      A.  Insurance.
 2      Q.  An initial matter.  I'm going to try -- I'm
 3   going to be asking questions, and you're going to be
 4   giving answers.  So we need to make sure for the
 5   court reporter's benefit that we are not talking over
 6   one another.
 7          So I ask that you let me finish my
 8   questions, and I would also -- I'm also going to try
 9   to let you finish your answers so that the court
10   reporter can get everything down.
11          So the first case was an insurance -- an
12   insurance coverage case or can you briefly describe
13   the circumstances just generally?
14      A.  Both of them are insurance cases.
15      Q.  Okay.  Let's focus on the first in time.
16          Which -- what was the nature of that
17   insurance case?
18      A.  About monetary recovery from an accident.
19      Q.  And were you the plaintiff in that case?
20      A.  Yeah.
21      Q.  Okay.  And you were suing the insurance
22   company?
23      A.  No, no, no, sorry.  I was being sued both
24   times.
```

2 (Pages 2 to 5)

Thompson Court Reporters, Inc
(312) 421-3377

Page 102

1 shirt as well?
2 **A. It's far back so I don't recall. I don't**
3 **recall.**
4 Q. Okay. Are you --
5 **A. I think Sergeant Greene had a white shirt.**
6 Q. But you don't recall what the other two were
7 wearing?
8 **A. Yeah, but they were wearing their uniforms**
9 **though.**
10 Q. You said that your shift on March -- or what
11 was your shift on March 22nd, 2012?
12 **A. 3:00 p.m. to 11:30 p.m.**
13 Q. Were you told in advance that Smith was
14 coming to Two North?
15 **A. No.**
16 Q. You only found out that he was there when
17 Officer Depke approached you?
18 **A. Yes.**
19 Q. And what did Officer Depke say to you?
20 **A. He said there is a patient here, I think he**
21 **needs your attention, and I went there.**
22 Q. Did he say anything else?
23 **A. No. That's it.**
24 Q. Did he say anything about his injuries?

Page 103

1 **A. I don't know.**
2 Q. Did he say anything about the people
3 accompanying Mr. Smith?
4 **A. No. He didn't.**
5 Q. When you -- when you first encountered
6 Mr. Smith, was he in Two North?
7 **A. He was in the hallway of Two North.**
8 Q. Is that -- there is a door -- I imagine
9 there is a door or a gate that leads into Two North?
10 **A. A couple of doors.**
11 Q. Okay. And it was Mr. Smith beyond those
12 doors?
13 **A. There's a couple of doors; one after the**
14 **elevator and another one to enter Two North itself.**
15 Q. And Mr. Smith was --
16 **A. Was already inside of Two North.**
17 Q. Okay. Is there like a receiving area within
18 Two North?
19 **A. No, no, no.**
20 Q. Is there some sort of reception or control
21 bubble or something like that?
22 **A. No, no, no.**
23 Q. And where was he -- where was he placed?
24 **A. He was where they search for contrabands**

Page 104

1 just immediately after the door.
2 Q. And was he sitting? Was he standing? Was
3 he laying [sic] down?
4 **A. I don't recall that. I don't know.**
5 Q. Do you recall was someone holding onto
6 him?
7 **A. I don't know. I don't know.**
8 Q. You don't recall whether he was laying,
9 sitting, or standing?
10 **A. No.**
11 Q. Do you recall whether he was conscious or
12 not?
13 **A. Yeah. He was conscious. He was combative.**
14 **He was uncooperative.**
15 Q. Do you know what a sternal rub is?
16 **A. No.**
17 Q. You don't know what a sternal rub is?
18 **A. Huh-uh.**
19 Q. Have you ever seen anyone rub someone's
20 sternum?
21 **A. No.**
22 Q. Never? Have you ever seen a doctor rub
23 someone's sternum to wake them up?
24 **A. No, no.**

Page 105

1 Q. So Mr. Smith -- was Mr. Smith conscious?
2 **A. Yeah. He was conscious.**
3 Q. But you don't know whether he was sitting,
4 standing, or laying down.
5     Was he restrained?
6 **A. No. I don't know. I know he was combative.**
7 **He was uncooperative, and we needed to provide him**
8 **with a gurney so they can take him to the ER.**
9 Q. Why did you have to provide him with a
10 gurney?
11 **A. Because he was uncooperative. He could be**
12 **restrained while on a gurney while they take him**
13 **downstairs.**
14 Q. Okay. Do you know if he had handcuffs on at
15 that time?
16 **A. I don't recall. I don't know.**
17 Q. Did he have shackles on?
18 **A. I don't know.**
19 Q. Where was Mr. Smith placed on the gurney?
20 **A. I told Sergeant Greene that this guy needs**
21 **to go downstairs. I must have called the PCA to get**
22 **a gurney. It took like maybe seven or eight minutes.**
23 **They brought the gurney, and we put him on it.**
24     **He was combative kicking everybody. So**

27 (Pages 102 to 105)

Thompson Court Reporters, Inc
(312) 421-3377

Page 106

1  he fell once like I said, and he was put back on the
2  gurney, and he was chained, you know, he was
3  handcuffed to the gurney.
4      Q.  What is a PCA?
5      A.  A PCA is -- it's like a CNA.
6      Q.  It's like a nurse's assistant?
7      A.  Nurse's assistant, yes.
8      Q.  Okay.  But you don't know what PCA stands
9  for?
10     A.  PCA is Cermak's fashion of a CNA.
11     Q.  Say that again.
12     A.  It's a Cermak -- Cermak's fashion of a CNA.
13     Q.  Okay.  You just call it a PCA at Cermak
14 instead of a CNA?
15     A.  Yeah, PCA.
16     Q.  Okay.  Do you know which PCA you asked to
17 get you a gurney?
18     A.  No.  I don't remember.  I don't remember.
19     Q.  You don't recall which PCA --
20     A.  No.
21     Q.  -- was working that day?
22     A.  No.  I don't remember.
23     Q.  So once the gurney arrived, did you
24 perform --

Page 107

1      A.  I think PCA stands for patient's certified
2  assistant or something like that.
3      Q.  So once the PCA brought the gurney over,
4  what happened next?
5      A.  We attempted to put Mr. Matthews [sic] on
6  the gurney.
7      Q.  Mr. Smith?
8      A.  Okay, Matthew Smith, and he was combative,
9  kicking officers, you know, kicking everybody.  I
10 don't want to be restrained, I don't want to be --
11 you know, I don't want to be -- he's uncooperative;
12 and while he was doing that, he was hyperactive.
13 While he was doing that, he fell once.
14     Q.  How was he kicking?
15     A.  Like when you are kicking your legs.
16     Q.  One leg at a time?
17     A.  No, both, one at a time, you know.
18     Q.  Okay.  When he was kicking, was he shackled?
19     A.  I don't know.
20     Q.  Could he kick if he was shackled?
21     A.  I don't know.
22     Q.  You don't know -- in your experience, you
23 have seen someone shackled before, right?
24     A.  Yeah, yes.

Page 108

1      Q.  Do you recall him actually kicking, making
2  contact with any officer?
3      A.  Yeah.
4      Q.  Who did he kick?
5      A.  I don't know.  He was kicking.
6      Q.  Did he kick you?
7      A.  Kicking in the air, kicking everywhere, you
8  know, attempting to say I don't want no -- I don't
9  want no treatment, I don't want to be treated,
10 uncooperative, agitated, you know, hyperactive.
11     Q.  Is it standard procedure to shackle inmates
12 who are being combative and aggressive?
13     A.  I don't know.  I don't know.
14     Q.  You don't know one way or another whether as
15 a general matter you would shackle an inmate --
16     A.  It depends on the security, you know.
17 That's their call.
18     Q.  If Mr. Smith was already shackled, would
19 they have removed his shackles?
20     A.  Not in that situation.
21     Q.  Okay.  But you're saying that he was kicking
22 people?
23     A.  Yeah.  He was kicking in the air.  He was
24 struggling.  He was uncooperative.  He was combative.

Page 109

1      Q.  In order to get him to the gurney, can you
2  describe the steps that you and the others took?
3      A.  I think the officers tried to put him on the
4  gurney.  He fell.  He rolled down, and they attempted
5  to put him in place and then handcuffed him onto the
6  side of the rails of the gurney.
7      Q.  Did he already have cuffs on?
8      A.  I don't -- I don't remember.  I don't
9  remember.
10     Q.  Do you recall whether he rolled off the
11 right side or the left side?
12     A.  No.
13     Q.  You don't recall?
14     A.  I don't recall.  I don't recall.
15     Q.  Do you recall what Mr. Smith was wearing at
16 that point?
17     A.  No.  I don't recall.
18     Q.  Do you recall who put Mr. Smith on the
19 gurney?
20     A.  I don't recall.  I know Officer Depke was
21 one.
22     Q.  He actually put someone on a gurney?
23     A.  Not by himself, you know.  There were a
24 couple of officers around.

Page 110

1 Q. How many people attempted to put Mr. Smith
2 on the gurney?
3 A. I'm not sure.
4 Q. Do you actually have a mental image of any
5 of this happening at all?
6 A. Yeah.
7 Q. But you don't recall what Mr. Smith was
8 wearing?
9 A. No.
10 Q. You don't recall who --
11 A. No.
12 Q. So what is your mental image then? Can you
13 describe it to me?
14 A. My mental image is probably he was wearing
15 like a pant, like trousers. That's about it.
16 Q. Okay. Describe what else -- can you step by
17 step -- did they lift him off the floor?
18 A. And then put back on the gurney.
19 Q. Well, I'm asking you.
20 Did they lift him off the floor?
21 A. Yes.
22 Q. Okay. But earlier you said that you didn't
23 recall whether he was sitting, standing, or laying
24 down.

Page 111

1 A. No, no, no. That's when they brought him
2 before we provide the gurney.
3 Q. So when the gurney was rolled in, do you
4 recall whether he was sitting, standing, or laying
5 down at that point?
6 A. I think the officers was putting him on the
7 gurney.
8 Q. From where?
9 A. You know, like holding his hands and his
10 pants -- and his legs, putting him on the gurney.
11 Q. Did they lift him off the floor or did they
12 just walk him over to the gurney?
13 A. I don't recall that. I don't know.
14 Q. Do you recall how Mr. Smith fell?
15 A. No.
16 Q. Do you recall what area of the body he fell
17 on?
18 A. No.
19 Q. Did you examine Mr. Smith after he fell?
20 A. I asked him -- I think I asked him I said
21 are you okay, and he said I'm all right, I don't need
22 no treatment, I don't want to be treated.
23 Q. Okay. How far off -- how tall is the
24 gurney?

Page 112

1 A. I'm bad at feet.
2 Q. Sure.
3 A. I know that but probably from here to here
4 (indicating), like maybe six or seven feet. I'm not
5 sure.
6 Q. That's how long it is?
7 A. Yeah.
8 Q. How high off the ground is it?
9 A. Maybe three feet.
10 Q. Okay.
11 A. Yeah.
12 Q. Were you concerned with Mr. Smith's health
13 after he fell off the gurney?
14 A. Yes. That's why I asked him --
15 Q. Okay.
16 A. -- Are you okay, and he said, I'm all right,
17 just I don't want to be treated.
18 Q. Did he brace himself with his hands when he
19 fell?
20 A. I don't know. I don't remember.
21 Q. But you recall being concerned with his
22 health?
23 A. Yes.
24 Q. And you recall asking him that specific

Page 113

1 question, Are you okay?
2 A. Yes.
3 Q. Do you recall whether he fell on his head?
4 A. No. I don't know. I don't recall.
5 Q. Once Mr. Smith responded that he was okay,
6 were you still concerned with his well-being?
7 A. Yes. That's why I said that he should be
8 transported to ER to be -- to have further
9 examination and treatment in the ER.
10 Q. So that's why you thought that he should be
11 transported to the ER because he fell off?
12 A. No, not necessarily, under the policy too
13 and the protocols.
14 Q. Was your plan to transfer him to the ER
15 before or after he fell?
16 A. Since I asked the officer, Sergeant Greene,
17 you got ER papers for him, and he said, No, we don't.
18 He gave me an indication that, you know, he hasn't
19 come from the ER. I said okay. I called into the
20 police and said that he has to be in the ER to face
21 medical clearance.
22 Q. And this conversation happened before you
23 attempted to put him on the gurney, right?
24 A. Right, right.

Page 114

1  Q. So he was already headed to the ER once --
2  strike that.
3     He was already headed to the ER at the
4  time that you were placing him on the gurney,
5  correct?
6  A. No, no, no. He wasn't. We had to provide
7  the gurney to have a safe passage to the ER.
8  Q. But you wanted to place him on the gurney in
9  order to easily transport him to the ER, correct?
10 A. Yes.
11 Q. Do you know an officer named Officer Drowns?
12 A. I've seen him around.
13 Q. Okay.
14 A. I don't recall if he was there that day.
15 Q. Do you know a lieutenant named
16 Lieutenant Pullems?
17 A. No.
18 Q. You don't know Lieutenant --
19 A. No.
20 Q. -- Pullems?
21 A. No.
22 Q. Do you know a lieutenant that supervises
23 Cermak?
24    Are you aware of who that person is?

Page 115

1  A. No.
2  Q. Do you ever interact with the lieutenant on
3  duty?
4  A. I don't know so...
5  Q. As a general matter, do you know who the
6  lieutenant on duty is in case you need to call for a
7  lieutenant?
8  A. It is listed on this, a step above. The
9  ones you can see are the sergeants. That's a step
10 above. I didn't see any lieutenant.
11 Q. You only ever deal with correctional officer
12 sergeants. You never deal with lieutenants?
13 A. No, no, no. I deal with all of them, but
14 I'm saying on this day and most of the days you
15 directly interact with the officers. Sergeant is a
16 step above officers. So you might not even talk to a
17 sergeant all day while you are working there. So I
18 don't know the lieutenant that you are talking about.
19 I don't know him.
20 Q. It's a her if that refreshes your
21 recollection at all.
22 A. Pardon me.
23 Q. It's a her/she. It's a woman,
24 Lieutenant Pullems.

Page 116

1     Does that refresh your recollection at
2  all?
3  A. No.
4     MR. KENNEDY: John, I have a copy of
5  Exhibit 3. I don't have it -- it is not marked as
6  Exhibit 3.
7     Do you want to remark it or can we just
8  stipulate to the fact that this is Exhibit 3?
9     MR. POWER: Let me double-check that it is
10 Exhibit 3.
11    Yeah, this is SAO Smith 13 which has
12 been previously marked Exhibit 13 -- strike that,
13 Exhibit 3 is Smith 13 for the record.
14 BY MR. KENNEDY:
15 Q. So I'm handing you what has been previously
16 marked as Exhibit Number 3, SAO Smith 13.
17    Have you ever seen this document before,
18 Mr. Alabi?
19 A. I don't know.
20 Q. You don't know one way or another whether
21 you've seen this before?
22 A. Probably I have.
23 Q. In what circumstance have you seen this?
24 A. I think I saw this, you know, when I was,

Page 117

1  you know. I saw some of this document when I, you
2  know, knew I was coming for this subpoena. I browsed
3  through. I never, you know.
4  Q. So you saw this document for the first time
5  when you were preparing for this deposition?
6  A. Yes. I think so.
7  Q. Okay. I'm just going to read from the
8  incident section, and I can represent to you that the
9  incident section was written by Officer Depke.
10 A. Okay.
11 Q. He testified to that effect in his
12 deposition.
13    "On the above date at approximately
14 19:30 hours R/O Depke received a transfer
15 from RCDC. Sergeant Greene and two other
16 receiving officers escorted Detainee Smith,
17 Matthew, Number 20120322134 to 2-N from
18 receiving. Detainee arrived to 2-N with
19 facial bleeding and a spit mask.
20 Nurse Alabi was on scene. Nurse Alabi is
21 assigned to 2-N and stated that the
22 detainee must be cleared by the emergency
23 room doctors and psych staff to be
24 admitted to 2-N."