# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MATTHEW SMITH,                          )
                                        )
        Plaintiff,                      )
                                        )
    vs.                                 ) No. 14 CV 1789
                                        )
COOK COUNTY, COOK COUNTY                )
SHERIFF TOM DART, SGT.                  )
CONNELLY, and UNKNOWN COOK              )
COUNTY CORRECTIONAL                     )
OFFICERS 1-5,                           )
                                        )
        Defendants.                     )

      The deposition of TIA PARKS, called by Plaintiff, for examination, pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions taken before Stephanie A. Battaglia, CSR and Notary Public in and for the County of DuPage and State of Illinois, at 70 West Madison Street, Suite 1800, Chicago, Illinois, on January 25, 2016, 10:38 a.m.

| Page 174 | Page 176 |
|---|---|
| 1  I had no notice of this deposition until<br>2 last week.<br>3   Q.  Is there anything you would change about<br>4 the report?<br>5   A.  Such as?<br>6   Q.  I am asking is there anything?<br>7   A.  It is kind of a vague question. It is<br>8 kind of open-ended.<br>9      I don't know if there is anything that I<br>10 would change about the report. I don't know off the<br>11 top of my head if there is anything I would change<br>12 about the report.<br>13   Q.  Would you have talked to Lieutenant<br>14 Pullems?<br>15   A.  Had I known that Lieutenant Pullems was<br>16 the person who completed this assessment on the<br>17 incident report, yes.<br>18   Q.  Would you have attempted to reach out to<br>19 Mr. Smith's medical providers at Cermak?<br>20   A.  I may have.<br>21      Although that, again, the -- didn't<br>22 determine whether or not your client was the subject<br>23 of unreasonable force in receiving, but I may have<br>24 reached out to them to garner more information with | 1 less thorough.<br>2   Q.  Did you ever talk to Officer Johnson, I<br>3 believe Elton Johnson, does that ring a bell?<br>4   A.  No, I did not because he was in<br>5 admissions, which is on a whole another floor.<br>6   Q.  Admissions, what is admissions?<br>7   A.  Cermak admissions and the emergency room.<br>8   Q.  How were you familiar with Mr. Johnson's<br>9 name?<br>10   A.  It is on the report in the assessment<br>11 that I just read.<br>12   Q.  Have you ever heard of any other inmates<br>13 at Cook County Department of Corrections alleging they<br>14 have been beaten by correctional officers in<br>15 elevators?<br>16   A.  I have heard any number of allegations<br>17 made by detainees of where they were beaten in<br>18 elevators, in the cell, in the day room, in the<br>19 hallway. So, yes, I have heard allegations.<br>20      I have investigated allegations, I have<br>21 heard allegations about detainees who allege they were<br>22 beaten in elevators, yes.<br>23   Q.  Have you sustained any allegations --<br>24 have you investigated any -- not just -- strike that. |
| **Page 175** | **Page 177** |
| 1 regard to his medical records or what they observed in<br>2 receiving.<br>3   Q.  You may have or you should have?<br>4   A.  May have.<br>5   Q.  What does that mean?<br>6   A.  Exactly what I said, I may have. I am<br>7 pretty sure that the word may is pretty<br>8 self-explanatory.<br>9   Q.  Well, would you have?<br>10      I am asking you if you had the<br>11 opportunity would you have?<br>12   A.  I may have.<br>13      I can't say yes or no because I am<br>14 speculating about what I would have done in hindsight.<br>15 I am trying to Monday morning quarterback myself.<br>16      Again, I may have reached out to them. I<br>17 can't say whether or not that would have made any<br>18 difference with regard to the findings of this case.<br>19   Q.  Would it have been best practices?<br>20   A.  I am sorry?<br>21   Q.  Would that have been best practices from<br>22 your position?<br>23   A.  Again, I can't say that that would have<br>24 changed the finding or made the report any more or | 1      Not just I asked earlier if you had heard<br>2 of allegations of beatings in elevators. Have you<br>3 investigated any cases in which detainees allege they<br>4 were beaten in the elevator?<br>5   A.  I just answered that question, but, yes.<br>6   Q.  Did you sustain any cases?<br>7   A.  I have sustained cases of allegations of<br>8 excessive force wherein one of the allegations was<br>9 that the detainee had been beaten in the elevator,<br>10 yes, I have.<br>11      Do I know how many? No.<br>12      Do I know which ones? No.<br>13   Q.  So do you believe it to be -- strike<br>14 that.<br>15      How many cases have you sustained where<br>16 an inmate was beaten in an elevator in the Cook County<br>17 Department of Corrections?<br>18      MR. POWER:  Objection, asked and<br>19 answered.<br>20      THE WITNESS:  I just answered that, I<br>21 don't know. I don't keep track of how many cases I<br>22 sustained.<br>23      There is no pressure to sustain more than<br>24 I not sustain or not sustain more than I sustain. I |

## Page 178

1 take each case individually on its face, I investigate
2 it as thoroughly as I can, and I come to a finding as
3 to whether or not there was employee misconduct based
4 on the evidence that I gather in the course of that
5 particular investigation. That is how I handle my
6 cases.
7 BY MR. KENNEDY:
8     Q. Can you remember more than one case in
9 which an inmate was beaten on an elevator where you
10 sustained it?
11     A. I don't remember off the top of my head.
12     Q. Do you know who it was more than one?
13     A. I don't remember off the top of my head.
14     Q. I am not asking an exact number.
15     A. I don't know how many. Honestly, I don't
16 know how many.
17     I would say that it has been more than
18 one, but I can't say with any accuracy or certainty
19 how many cases I have sustained about someone being
20 beaten on the elevator.
21     Q. Who would know that information?
22     A. You would need to speak to someone at the
23 Office of Professional Review.
24     Q. Who would that person be?

## Page 179

1     A. You can contact (773) 674-7580 and speak
2 to our administrative staff. That is outside the
3 scope of my employment, I do not fulfill legal
4 requests. Or you can certainly contact the CCSD legal
5 department, you can contact Ann Catherine Brady,
6 whomever it is you contacted for discovery, and they
7 can contact the pertinent people.
8     That is not something I do, I don't do
9 reporting so I don't know for certain.
10     Q. Do you believe it to be a common practice
11 that inmates are beaten in elevators at the Cook
12 County Department of Corrections?
13     A. You are kidding?
14     Sir, I don't have -- with regards to that
15 question I have investigated cases and I have
16 sustained and not sustained allegations of excessive
17 force based on the evidence. I cannot speak to
18 whether or not it is a common practice or a
19 commonality of detainees being beaten, but it is a
20 very vague and leading type of question where you are
21 trying to get me to say that this is a common
22 practice.
23     I can't say that it is common practice
24 that they are beaten on elevators or any such thing, I

## Page 180

1 can't say that it never occurs. And when it does
2 occur and there is sufficient evidence to substantiate
3 the allegations we certainly do sustain those cases.
4 But I am not going to say, yes, that that is a common
5 practice.
6     Q. Did you ever interview Mr. Smith?
7     A. No.
8     Q. Who did?
9     A. Rochelle Parker.
10     Q. Anyone else?
11     A. Not that I know of.
12     Q. I thought you said it was always two
13 people who interviewed, who conducted these interviews
14 together, because that was standard procedure?
15     A. Usually. But the name on the bottom of
16 that memorandum is Rochelle Parker.
17     Q. There is no second name?
18     A. I have no clue.
19     I can look for you if you like.
20     Q. You can determine from --
21     A. Sure, I can look at the memorandum that
22 she submitted if you like.
23     MR. POWER: SAO Smith 1377, it is the
24 first sentence.

## Page 181

1     THE WITNESS: John Pate was the second
2 person.
3 BY MR. KENNEDY:
4     Q. And who is that?
5     A. He was an investigator with the Office of
6 Professional Review.
7     Q. He is no longer there?
8     A. No.
9     Q. Do you know what he is doing now?
10     A. I believe the last I heard he was the
11 Chief of Police in University Park.
12     Q. Where is University Park?
13     A. Illinois.
14     Q. Did you ever talk to Rochelle Parker or
15 John Pate about their interview of Mr. Smith?
16     A. No.
17     Q. Did you have anything beyond this
18 memorandum of investigation?
19     A. From?
20     Q. Regarding the interview.
21     A. No.
22     Q. Do you believe it was wise for Rochelle
23 Parker and John Pate to interview Mr. Smith while he
24 was at Stroger Hospital in the trauma unit?

Page 182

1  A. Sir, I am not going to speculate about
2  someone else's investigation. That was their
3  investigation, I can only speak to you about mine.
4      I am not going to speculate about whether
5  or not they should or should not have interviewed them
6  when they did.
7  Q. Would you have interviewed Mr. Smith a
8  day after the alleged incident in a trauma unit?
9  A. If I was told to do so, yes, I would.
10 Q. If you had to make an independent
11 judgment on your own would you have done so?
12 A. I don't know, it depends on the
13 circumstances.
14 Q. The circumstances are that he is in the
15 trauma unit, would you have interviewed him?
16 A. Well, if I needed to find out what was
17 going on I may have interviewed him, yes, I may have.
18 Q. In what circumstances would you have
19 needed to find out what was going on?
20 A. Well, I believe in this case this
21 detainee sustained significant injuries and they
22 wanted to move quickly to initiate an investigation
23 into the matter, which they did by interviewing him
24 the next day.

Page 183

1  Q. When was the investigation initiated?
2  A. They interviewed him March 23, 2012,
3  which was the next day.
4  Q. So you are saying they opened a file at
5  that point?
6  A. I don't know.
7  Q. Because there is no OPR case number on
8  here.
9  A. Okay, so.
10 Q. Typically when you interview a detainee
11 are you going to open a file?
12 A. If there was no file opened at that time
13 they would not have an OPR case number.
14      That doesn't mean there wasn't a file
15 opened on it afterward. And I have no knowledge of
16 that because I have already told you that case
17 management is outside the scope of my employment, you
18 would need to contact the Office of Professional
19 Review and ask them.
20 Q. Did you review the prior case file?
21 A. No, I did not review the prior case file.
22      What I did was -- when I received this
23 case file I started from scratch. I was later told
24 that there was a second case file and then I was given

Page 184

1  this interview, this memorandum, as well as the video.
2  That is all that I did with that file.
3      I didn't even do anything, I got that
4  from the records department.
5  Q. The only thing you reviewed in the prior
6  case file was this memorandum on SAO Smith 001377 and
7  the videotapes you received, that is it?
8  A. That is it. I don't know if anything
9  else was in -- was even in that case file.
10 Q. Why didn't you review the rest of the
11 case file?
12 A. Well, this is a separate case. I don't
13 -- if I am starting from scratch it is -- from my
14 understanding, I asked for any interviews that had
15 been conducted and any video and any pertinent or
16 relevant information that was in there and that is
17 what I was given, was the memorandum and the
18 videotape.
19     To the best of my knowledge none of the
20 witnesses or the accused have been interviewed in that
21 prior case. They were being interviewed in this case.
22 So I had no cause to go through prior evidence when I
23 already was gathering evidence as if this was a brand
24 new case because that is what it was so I did ask for

Page 185

1  any relevant information, I did ask --
2  Q. Who determined what was relevant?
3  A. Honestly I don't know.
4      I gave that request over to the records
5  department because it was -- I believe it was Director
6  Merriam Brentiss, she is a director of another unit,
7  was the one who found out that it was a second case, a
8  previous case that had been closed out.      And
9  then we asked the records department to give us the
10 information, the memorandum and the video.
11 Q. But you also asked for other relevant
12 information?
13 A. I said any relevant information. I don't
14 know what was in that case file. There may not have
15 been anything else in there.
16 Q. So you believe that they determined that
17 these items, the report or the memorandum and the
18 videos, were the only things that were relevant?
19 A. As -- to the best of my knowledge that is
20 what I received after I asked for information.
21 Q. Given that Mr. Smith was on
22 antipsychotics at the time of his interview, do you
23 think that was appropriate?
24      Let's just assume, maybe you don't know