IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| MATTHEW SMITH, | ) |
| Plaintiff, | ) |
| v. | ) No. 14 C 1789 |
| COOK COUNTY, COOK COUNTY SHERIFF TOM DART, SGT. THOMAS CONLEY, AND UNKNOWN COOK COUNTY CORRECTIONAL OFFICERS, | ) Hon. Virginia M. Kendall |
| Defendants. | ) |

## MEMORANDUM ORDER AND OPINION

Plaintiff Matthew Smith, a detainee in the custody of Cook County Jail, filed suit against Sergeant Thomas Conley, a Cook County Correctional Officer, and other unknown Cook County Correctional officers under 42 U.S.C § 1983, alleging that Defendants used excessive force against him and failed to intervene to put a stop to that force in violation of Smith's Fourth Amendment rights. (Dkt. 1 ¶¶ 23–27.) Smith also brought a *Monell* claim against Cook County Sheriff Tom Dart, alleging that policies, practices, and customs in the Cook County Sheriff's Department created an environment in which inmates like Smith did not receive proper protection from abuse by correctional officers and where allegations of abuse by officers were not properly investigated. (*Id.* ¶¶ 28–33.) Additionally, Smith brought a state law *respondeat superior* claim against Dart for negligent supervision and intentional infliction of emotional distress on the part of his agents. (*Id.* ¶ 34–35.) Finally, Smith brought an indemnification claim under the Illinois Tort Immunity Act against Cook County for any damages arising from the actions of the other defendants. (*Id.* ¶¶ 36–37.)

1

Following the close of discovery, Defendants filed this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, arguing that Smith failed to exhaust all available administrative remedies before filing suit and that Sgt. Conley did not use excessive force against Smith. (Dkt. 61.) For the reasons state below, Defendants' Motion [59] is denied.

## STATEMENT OF FACTS

### I. Events of March 22, 2012

According to a report by Investigator Tia Parks of the Cook County Sheriff's Office of Professional Review ("OPR"), Smith was involved in a physical altercation with Sergeant Daniel McCall on March 22, 2012 when Smith refused to exit lock-up and go to court. (Def. SOF ¶ 9.) Smith has no recollection of any such altercation. (Def Ex. 1, 94:18–23.)

Video footage from later on March 22 at Division 5 of Cook County Jail ("CCJ") shows Officer Trevizio enter Smith's cell. (Def. SOF ¶ 11.) Upon entering the cell, Smith attempted to bite Trevizio. (*Id.*) In response, Trevizio struck Smith on the right side of his face near his eye. (*Id.* ¶ 12.) Trevizio then proceeded to spray Smith with pepper spray. (*Id.* ¶ 13.)

Later that day, Sergeant Thomas Conley had a verbal dispute with Smith outside of Smith's cell. (Def. SOF ¶ 14.) Handheld video footage taken by one of the correctional officers shows Conley conferring with other officers, a supervisor, and medical professionals outside of Smith's cell. (Def. SOF ¶ 14.)[1] The parties to this meeting decided to send Smith as a "direct admit" to the psychiatric unit ("2-North") of Cermak Hospital. (*Id.*) Two of these individuals, Sergeant Conley and Lieutenant Queen later testified that they believed Smith was experiencing a psychotic episode. (Pl. SOAF ¶ 4.) Dr. Lassen, a psychiatrist assigned to Division 5, assessed Smith's behavior and confirmed that he was experiencing some severe form of psychiatric

---

[1] CCJ rules required that officers record by handheld device any pre-planned use of force, like the possible removal of Smith from his cell and transport to a hospital. (Pl. SOAF ¶ 10.)

2

disorder and ordered that he be sent to Cermak Hospital where he received a variety of medications and was placed under close observation. (Pl. Ex. 13, Lassen Dep. 57:11–20.) On Dr. Lassen's order, Lieutenant Queen then ordered a transport team to remove Smith from his cell and take him to 2-North at Cermak Hospital. (Pl. SOAF ¶ 9.) The video further shows Conley and two other officers place a spit mask on Smith's face before extracting him from the cell and using force to place him on a cart to send him to Cermak Hospital. (Def. SOF ¶¶ 15, 54; Pl. SOAF ¶ 12.)

The handheld video camera was turned off upon Smith's arrival at Cermak Hospital. (*Id.* ¶ 16.)[2] Sergeant Conley directed other officers throughout Smith's transport to Cermak Hospital, including directing Officer Cosimini to videotape the transport, ordering Officer Vale to place a hood over Smith's head, and directing other officers to assist as necessary. (Pl. SOAF ¶ 11.) According to Conley, he did not continue with the transport team past the entrance of Cermak Hospital and onto the elevator up to 2-North. (Pl. Ex. 7, Conley Dep. 143:18–144:1.)[3]

The transport team then placed Smith on an elevator going up to 2-North from the lower level of Cermak Hospital (Pl. Resp. ¶ 18), a ride that only takes a matter of seconds. (Pl. Ex. 15, Drowns Dep. 51:23–52:5.) On a Sheriff's Office Incident Report, it is estimated that the transport team and Smith arrived at Cermak at approximately 7:10 p.m. and that they arrived at 2-North at approximately 7:30 pm. (Pl. Ex. 23.) Smith alleges that this gap in time was so long because the officers took several trips up and down the elevator in order to beat him up. (Pl. SOAF ¶ 21.) Smith claims that the transport team kicked and punched him during the elevator

---

[2] The parties dispute when the camera should have been turned off pursuant to HIPAA and Cook County Department of Corrections ("CCDOC") rules. Defendant claims that common practice and CCJ's interpretation of HIPAA dictate that video should be stopped upon a detainee's arrival at a medical facility. (Def. SOF ¶ 16.) Smith claims the video should have remained on during the entire transport, including transport within the hospital. (Pl. Resp. ¶ 16.)

[3] Edwin Drowns, an employee at Cermak who rode the elevator with the transport team, could not recall whether Conley rode the elevator with them. (Pl. Ex. 15, Drowns Dep. 47:7–23.)

ride (Pl. SOAF ¶ 19), but no witness testimony corroborates this allegation. (Def. Resp. ¶ 19.) Smith testified that he went in and out of consciousness during this beating until a kick to the head made him completely lose consciousness. (Pl. SOAF ¶ 25.) Despite Conley's assertion that he was not present during the elevator ride, Smith alleges that Conley was on the elevator because he recalls a heavy-set, bald-headed, African-American man in a white sergeant's uniform present on the elevator. (Pl. SOAF ¶ 23.)[4] Officers present gave conflicting testimony, albeit years after the event took place, as to the number of officers that were present on the elevator. (Def. Resp ¶ 26.)

When the elevator arrived at 2-North, the nurse, Augustus Alabi, refused to accept Smith as a patient until after he was processed through the emergency room. (Def. SOF ¶ 20.) Alabi testified that Smith was combative and uncooperative (Def. Ex. 15, Alabi Dep. 105:9–24) and needed to go to the emergency room to receive treatment for his bloody mouth. (Pl. Ex. 14, Alabi Dep. 135:1–11.) Lieutenant Pullums, a non-medical employee at 2-North, noticed that Smith had facial injuries as soon as he arrived at 2-North—he was bleeding from his mouth and had a swollen eye. (Pl. Ex. 12, Pullums Dep. 101:1–9.) Pullums wanted incident reports to reflect that Smith had been injured before he was received by her staff at 2-North. (Pl. Resp. ¶ 32.) During Smith's short stay at 2-North, he fell off his gurney and landed on his face and side. (Def. Resp. ¶ 20.)

Smith was transferred to the emergency room where Dr. Bonaparte examined him and found bruises on both sides of Smith's eyes, both sides of his upper body, his armpits, both sides of his upper body, and both sides of his legs. (Pl. SOAF ¶ 34.) Dr. Bonaparte testified that these injuries were likely not caused by a single fall off of a gurney. (Pl. Ex. 3, 114:13–16.) Upon

---

[4] Smith did not know the names of any of the officers who allegedly beat him on March 22, 2012 until he saw Officer Conley when returning from court on April 6, 2012. He learned the names of the other officers allegedly involved through discovery in this case. (Pl. SOAF ¶ 38.)

4

giving Smith treatment in the emergency room, Bonaparte transferred Smith to Stroger Hospital. (Pl. Resp. ¶ 21.)

Dr. Nagy at Stroger Hospital examined Smith later that day. (Pl. SOAF ¶ 35.) Nagy's chart and subsequent testimony indicate that when Smith arrived at Stroger he had bruising in and around his eyes, bruising on his neck, a large amount of bruising to both shoulders and the right side of his chest, a large abrasion on his right shoulder, and abrasions on both legs. (Pl. Ex. 4, Nagy Dep. 30:11–20.) He had also suffered a collapsed lung and a small fracture to an eye socket. (Pl. SOAF ¶ 35.)

**II. Smith's Grievances**

On March 23, 2012, Investigator Rochelle Parker from the OPR met with Smith while he was a patient at Stroger in order to investigate the possible use of excessive force against him. (Def. Ex. 2, Parker Dep. at SAO Smith 878.) Smith informed her that after he was arrested on March 20, Chicago Police placed him in a van and beat him. (*Id.*)[5] Smith believed that these officers wanted to kill him. (Def. SOF ¶ 23.)[6] In that interview, he also claimed that correctional officers later dragged him out of his cell, placed a bag over his head and beat him. (*Id.*) Smith did not reference any alleged beating in the Cermak elevator during this interview. (Def. SOF. ¶ 25.) However, Parker determined that Smith's behavior during her interview with him was consistent with that of someone experiencing a psychotic episode. (Pl. Resp. ¶ 23.)

It is undisputed that on April 1, 2012, Smith filed a grievance that references an alleged assault that took place the day he was processed. (Def. SOF ¶ 26.) The grievance report explained that officers had dragged Smith out of his cell, sprayed him with pepper spray, and

---

[5] Defendants claim he met with Tia Parks. (Def. SOF ¶ 8.) However, Defendants' citation to that claim is a document describing Rochelle Parker's meeting with Smith. Tia Parks claims never to have met Smith. (Pl. Ex. 1, Parks Dep., 180:6–7.)

[6] Smith also told Parker that on March 20, he attempted to shut down Receiving at CCJ by convincing thirty other detainees to call themselves "Matthew Smith." (Def. SOF ¶ 24.)

5

placed a surgical cap over his head such that he could not see where he was being taken. (Def. SOF ¶ 27.) According to the report, the next thing Smith remembered was waking up in Stroger Hospital. (*Id.*)

Smith's grievance does not reference any beating in the Cermak elevator or in any place other than the receiving area of the jail. (Def. SOF ¶ 31.) Smith agrees that he does not describe the location of subsequent beatings, but failed to do so because his head was covered such that he could not see where the officers were taking him. (Pl. Resp. ¶ 31.)

By way of response to the grievance report, Smith received a notification that his grievance needed to be forwarded to CCDOC (Def. SOF ¶ 29). Smith did not appeal the forwarding of his grievance to CCDOC because he did not object to that referral. (Pl. Resp. ¶ 30.) Smith never checked on the status of his investigation because he did not believe he was required to do so. (Pl. Resp. ¶ 32.)

On April 11, 2012, Smith filed another grievance regarding a subsequent incident, also allegedly involving Conley, which took place on April 6. (Pl. Resp. ¶ 33.) In this grievance, Smith requested 1) protection from further aggression by Conley, 2) that his injuries be documented and treated, and 3) that the personnel involved in the incident be suspended and receive further disciplinary action. (*Id.*) This grievance did not reference a beating in the Cermak elevator. (*Id.* at ¶ 38.) In response to this second grievance, a complaint register form was issued and forwarded to the OPR. (Pl. Resp. ¶ 36.) Smith did not appeal the referral of the grievance to the OPR because he interpreted that referral to indicate that "something [was] happening toward correcting a problem." (Pl. Resp. ¶ 37.) As with the first grievance, Smith never inquired as to the status of this second grievance, but claims he was never required to do so and that there was no mechanism available to him by which to do so. (Pl. Resp. ¶ 39.)

On May 28, 2012, Smith wrote a third grievance form, which stated that he was "in pain every day because of the brutal beating [he] suffered on 3/22/12 coming through [R]eceiving." (Pl. Resp. ¶ 39.) In this grievance, he requested stronger pain medication, that he see a doctor, that he receive rehabilitative therapy, and that he receive compensation for his injury. (*Id.*) The parties dispute whether Smith ever actually filed this grievance, but agree that he never made any appeal with respect to this grievance nor did he receive any compensation in response to his request. (Pl. Resp. ¶¶ 40–42.) Based on the record evidence, Defendants are correct that there is no indication that Smith ever filed this grievance because none of the sections required to be completed by jail employees are filled out. (Def. Ex. 15, Smith Ex. 8.)

Defendants claim that Smith's grievances only ever referenced an alleged beating in Receiving and claim that Smith admitted that he was never assaulted. (Def. SOF ¶ 49.) Despite Defendants' claims to the contrary, Smith never made that admission. In the deposition testimony to which Defendants cite, Smith is unable to describe the exact location of the beating and only later understood that it occurred on the elevator, but he maintains throughout the deposition that he was assaulted. (Ex. 1, Smith Dep. 288:2–289:16; 293:18–24). And his grievances merely indicate that he did not know precisely where the beatings took place because his eyes were covered. (Def. Ex. 15 at SAO Smith 304.)

During Smith's detention at CCJ, there existed an established grievance procedure. (Def. SOF ¶ 43.) CCJ did not make Smith aware of the process for filing grievances, nor did he receive a copy of the Inmate Information Handbook. (Def. Ex. 1, Smith Dep. 220:12–15.) He did, however, become aware of the grievance procedures by word of mouth from other detainees and therefore knew how to navigate the process. (*Id.* 219:19–22.) No Correction Rehabilitation

Worker ("CRW") ever refused to accept one of Smith's grievances nor was Smith ever prevented from filing any grievance. (Pl. Resp. ¶ 46.)

CCJ procedures required detainees to file grievances within fifteen days of the incident complained about, and to file an appeal within fourteen days after receiving a response. (Def. SOF ¶ 45.) Smith disagrees with this, claiming that these timing requirements did not go into effect until after the March 2013 amendments to the Inmate Information Handbook. (Pl. Resp. ¶ 45.) However, the testimony of John Mueller, the supervisor of the grievance process, contradicts Smith's unfounded understanding of the amendment because Mueller testified that the amendments did not change these deadlines. (Ex. 16, Mueller Dep. 36:12–20.)

## **STANDARD OF REVIEW**

Summary judgment is proper when the evidence developed through the course of discovery reveals "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In determining whether a genuine issue of material facts exists, this Court construes all facts and draws all reasonable inferences in favor of the non-moving party. *PQ Corp. v. Lexington Ins. Co.*, No. 16-3280, 2017 WL 2772587, at *3 (7th Cir. June 27, 2017). The Court will nonetheless limit its analysis of facts to evidence and that the parties have properly identified and supported in their Rule 56.1 statements. *Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). In order for the Court to infer the existence of a particular fact, the party alleging the fact must provide more than a conclusory assertion; rather, the party must cite concrete evidence that establishes the truth of the matter asserted. *Drake v. Minn. Mining Co.*, 134 F.3d 878, 887 (7th Cir. 1998). As the party opposing the motion for summary judgment, Smith "gets the benefit of

all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 314 (7th Cir. 2011).

## DISCUSSION

### I. Smith had Properly Exhausted his Administrative Remedies Before Filing the Instant Action

The Prison Litigation Reform Act ("PLRA") prohibits parties from bringing § 1983 actions based on prison conditions before all available administrative remedies have been exhausted. 42 U.S.C. § 1997e(a). Section § 1997e(a) requires "proper exhaustion," which means that plaintiffs must "compl[y] with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). This Court requires strict compliance with the prison grievance system. *See Santiago v. Anderson*, 496 Fed.App'x 630, 636 (7th Cir. 2013). Without proper exhaustion of the prison's grievance process, the prisoner's claim remains "indefinitely unexhausted." *Dole v. Chandler*, 438 F.3d 804, 808 (7th Cir. 2006). That being said, the statute only requires prisoners to exhaust grievance procedures of which they have been informed. *King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015). "When a jail fails to inform inmates of the grievance procedure or grievance rules are applied haphazardly, inmates cannot be expected to follow the established procedures." *Lloyd v. Dart*, No. 14 C 69, 2016 WL 232422 (N.D. Ill. Jan. 20, 2016) (citing *King v. McCarty*, 781 F.3d 889, 896 (7th Cir. 2015)). Moreover, it is not the detainee's burden to prove that he has exhausted all administrative remedies available to him; instead, "the defendant asserting a failure to exhaust has the burden of establishing this affirmative defense" by a preponderance of the evidence. *Conley v. Anglin*, 513 Fed.App'x. 598, 601 (7th Cir. 2013).

Defendants allege that Smith had failed to exhaust the administrative remedies available to him at CCJ prior to filing this suit by 1) failing to file a grievance that alleged an assault in the

Cermak elevator or by specific employees and 2) failing to appeal his grievances or the referral of his grievances to the OPR. (Dkt. 61 at 10–11.)

### A. Specificity of Grievance

A prisoner's grievance must include sufficient specificity to alert prison officials to a problem such that the officials have a fair opportunity to address it. *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011). A prisoner that fails to articulate with specificity the grievances for which he seeks redress has not properly exhausted his administrative remedies. *McCoy v. Gilbert*, 270 F.3d 503, 510 (7th Cir. 2002). Likewise, a prisoner whose administrative grievance covers a subject matter different from the subject matter of the complaint filed in court has not properly exhausted his remedies. *Stites v. Mahoney*, 594 F. App'x 303, 305 (7th Cir. 2015) If a prisoner files a complaint in court on a subject matter not yet referred to prison administrative procedures, a court cannot hear the prisoner's claim without frustrating Congress's intention in passing the PLRA. *See Correction Officer Porter v. Nussle*, 534 U.S. 516, 517 (2002) (determining that the PLRA's dominant concerns include "promot[ing] administrative redress, filter[ing] out groundless claims, and foster[ing] better prepared litigation of claims aired in court…").

Defendants rely in part on *Johnson v. Johnson*, a Fifth Circuit case that is inapposite. 385 F.3d 503 (5th Cir. 2004). In *Johnson*, the Fifth Circuit held that a "grievance must provide administrators with a fair opportunity under the circumstances to address the problem . . . and . . . this will often require . . . that the prisoner's grievance identify individuals who are connected with the problem." 385 F.3d at 522. Defendants claim this holding supports their position due to Smith's failure to allege in his grievances the names of specific officers who deprived him of his bodily rights. (Dkt. 61 at 9.) However, *Johnson* also holds that a functional description like a

reference to "guards in shower room" on a certain date would provide sufficient specificity for prison administrators to conduct an investigation. *Johnson*, 385 F.3d at 523; *See also Abney v. Younker*, 13 C 01418, 2015 WL 463243, at *15–16 (M.D.Pa. Feb. 4, 2015) (grievance was specific enough given that detainee was semi-conscious during assault). By including the date, descriptions of his injuries, that it happened during his transfer to 2-North but that he could not specify the exact location because his eyes were covered, and that several officers were involved, Smith's grievances included sufficient specificity to enable prison authorities to investigate the matter.

### B. Appeal of Grievances

Defendants claim that Smith cannot have exhausted his administrative remedies because he did not appeal the forwarding of his grievance to the OPR. (Dkt. 61 at 10–11.) The grievance forms Smith submitted included this statement: "to exhaust administrative remedies, appeals must be made within 14 days of the date the inmate received the response." (Dkt. 60, Ex. 15 at 1.) At issue, however, is what classifies as a "response" that must be appealed. The only response Smith ever received to his April 1, 2012 grievance was a notification that it was being forwarded to the OPR. (Def. Ex. 15 at SAO Smith 301.) This response did not indicate a particular disposition of his grievance and did not contain the signature of the superintendent. (*Id.*) Had it contained an indication that the grievance was not sustained and had the superintendent signed it, then an appeal would have been appropriate. Because he did not receive a response to that effect there was no reason for Smith to appeal, and his failure to do so does not mean that he failed to exhaust his administrative remedies. *See, e.g., Jackson v. Cook Cty. Sheriff Thomas Dart*, No. 13 C 7713, 2016 WL 5390954, at *3 (N.D. Ill. Sep. 27, 2016) ("It defies common sense to read that response [informing the prisoner that his grievance was being forwarded to OPR] as negative

action on his grievance, such that an appeal was appropriate."); *See also Crayton v. Graffeo*, 10 F.Supp.3d 888, 895 (N.D. Ill 2014) (quoting *Worthem v. Boyle*, 404 Fed.App'x. 45 (7th Cir. 2010)) (explaining that the inmate has a choice: "he either ha[s] to appeal the response indicating that his grievance was forwarded to OPR or give the 'process a chance to work'" by awaiting a response from OPR."). Absent a dispositional response to his grievance, the requirement that Smith appeal his grievance within fourteen days had not yet come into effect.

Defendants make precisely the same failed argument that Sheriff Dart made in *Jackson*, in which this Court found "no reason why [plaintiff's] decision to await the results of the OPR process should be viewed as inappropriate or impermissible." *Jackson*, 2016 WL 5390954, at *4. Just as in *Jackson*, it is difficult to understand why Smith would have chosen to appeal the CCJ's decision to forward his grievance to a decision-making body for review and investigation. "Waiting for the results of the OPR investigation was a perfectly sensible thing to do." *Id.* at *2–3.

Defendants have also failed to describe how Smith would have known that he needed to appeal the forwarding of his grievance to the OPR given that he never had an Inmate Information Handbook. (Pl. SOAF ¶ 47.) In keeping with the principle that prisoners need not exhaust remedies of which they are not made aware, the Court rejects Defendants' argument that Smith had not exhausted available remedies prior to filing this suit. *See Harper v. Dart*, No. 14 C 01237, 2015 WL 3918944 (N.D. Ill. 2015) (rejecting Defendants' argument that a detainee had failed to exhaust the administrative remedies available to him by failing to appeal his grievance because CCJ did not give him a Handbook, and even if he had received one, the Handbook "is silent about repealing requests"). Accordingly, this suit is properly before the Court and Defendant's affirmative defense of failure to exhaust is dismissed.

## II. A Genuine Issue of Material Fact Exists as to Conley's Alleged Use of Excessive Force

A review of the statements of material facts shows that there are many fact disputes that must be resolved by a jury as to whether Conley used excessive force against Smith in the Cermak elevator. "Summary judgment is proper only if there is no reasonably contestable issue of fact that is potentially outcome-determinative." *EEOC v. Sears, Roebuck, & Co.*, 233 F.3d 432, 436 (7th Cir. 2000). This is not the case here. The parties continue to dispute whether Conley assaulted Smith during his transport to 2-North and whether Conley was even present on the elevator where the beating allegedly took place. These are outcome-determinative questions of fact that remain reasonably contestable, so the Court must leave them to the finder-of-fact at trial. *See, e.g., Taylor v. Kveton*, 684 F.Supp. 179, 183 (N.D. Ill 1988) (holding that summary judgment was inappropriate in an excessive force case where the plaintiff was rendered semiconscious and unable to tell exactly who beat him).

Given the evidence presented during discovery, a reasonable jury could render a verdict in favor of either side depending on fact and credibility determinations. Defendants point out that there is no concrete evidence or witness testimony that corroborates Smith's allegation that Conley was on the elevator up to 2-North with Smith and the transport team. But Smith's testimony and the reasonable inferences that can be made regarding who transported him, the medical records, the degree and location of his injuries in comparison to Defendants' testimony, and the surveillance are sufficient to place the facts in dispute. Moreover, officers have given conflicting testimony about the number of officers that were on the elevator with Smith up to 2-North. It is for the jury to make credibility determinations about which version of the alleged facts is most compelling. "Credibility determinations, the weighing of evidence, and the drawing

of legitimate inferences from the facts are jury functions, not those of a judge" when she is ruling on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## **CONCLUSION**

Defendants have failed to demonstrate that Smith did not properly exhaust the administrative remedies available to him at CCJ. Disputes of material fact remain as to Smith's excessive force claim. Motion for Summary Judgment [59] is denied.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: August 2, 2017